IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 7, 2017

### STATE OF TENNESSEE v. DEANGELO TAYLOR

**Appeal from the Criminal Court for Shelby County**
**No. 11-03335    W. Mark Ward, Judge**

---

### No. W2016-00718-CCA-R3-CD

---

The defendant, Deangelo Taylor, appeals his Shelby County Criminal Court jury convictions of second degree murder and attempted aggravated robbery, claiming that the trial court erred by admitting certain witness testimony and that the evidence was insufficient to support his convictions.  Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Joseph A. McClusky (on appeal) and Lauren Fuchs (at trial), Memphis, Tennessee, for the appellant, Deangelo Taylor.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Tracye Jones and Omar Malik, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

In May 2011, the Shelby County Grand Jury charged the defendant with one count each of premeditated first degree murder, aggravated robbery, and employing a firearm during the commission of a dangerous felony, arising out of the November 25, 2009 shooting death of the victim, Robert Williams.  The trial court conducted a jury trial in July 2015.

The State's proof at trial showed that the victim and his roommate, Larry Martin, shared an apartment in Memphis; two of the victim's cousins and one of the victim's uncles lived there as well.  Mr. Martin testified that, on the morning of November 25, 2009, he saw the victim "counting money" although Mr. Martin did not

know the amount of the money. Sometime after that, the victim left the apartment and drove away. Mr. Martin later looked out the front apartment window and saw the victim standing near his vehicle; it appeared to Mr. Martin that the victim had just arrived home. Mr. Martin noticed that two men were standing close to the victim and that a neighbor, Wilbur Ruffin, was nearby working on his own vehicle. Mr. Martin stated that the faces of the two men talking to the victim were obscured by "hoodies," but he noticed that one of the men was a few inches taller than the other man. While the victim was speaking with the two men, Mr. Ruffin approached and joined the conversation, which lasted "less than five minutes." When the victim reentered the apartment, he "was mad . . . about something." Although Mr. Martin never saw any of the men with a gun and did not witness a robbery, Mr. Martin testified that the victim told him that he had been robbed, and he heard the victim say that "he needed some peace" and that "these Ns have me messed up, F'd up." Shortly thereafter, the victim left the apartment with his cousin, Tony Winters.

Mr. Winters testified that on the evening of November 25, the victim asked Mr. Winters "to come ride with him" because someone had robbed him. Mr. Winters stated that the victim did not tell him where they were going; he just told Mr. Winters to "come ride with him":

> We just went to riding and looking. He was looking for someone. I don't know who he was looking for. But then, like, I guess when he saw that person whoever he saw, he was flinching. I asked him who did he see. He ain't said – he ain't say nothing so we just kept on riding. Then next thing I know I heard gunshot[s] and I just ducked down in the car and stayed down until the gunshot[s], you know, stopped. But he kept looking up. And when the – that last time he looked up, a bullet caught him in the head.

Mr. Winters estimated that he heard "about 11 or 12" gunshots. Mr. Winters never saw the shooter, and he insisted that neither he nor the victim had a firearm with them that night.

Wilbur Ruffin, the victim's neighbor, testified that on the evening of November 25, he was working on his vehicle just outside of his apartment when the victim arrived at home, parking his car near Mr. Ruffin's vehicle. Mr. Ruffin denied speaking with the victim that evening or engaging in a conversation with anyone. Mr. Ruffin stated that, approximately 20 minutes after the victim arrived, "two masked gentlemen" wearing hooded shirts approached the victim, who was standing by the driver's side of his vehicle. Mr. Ruffin said that the two men "laid [the victim] on the

-2-

ground" and "checked his pockets or something like that" before fleeing. Mr. Ruffin stated that he "th[ought] he s[aw] a gun" on one of the two men who accosted the victim. Mr. Ruffin could not recall whether one or both of the men rifled through the victim's pockets. Mr. Ruffin agreed that his memory had "become a little fuzzy" in the intervening years, and the prosecutor presented Mr. Ruffin with the statement he gave to police officers on January 27, 2010, in an effort to refresh his recollection. After reviewing the four-page statement, Mr. Ruffin testified that "most of [the statement was] untrue" and that he did not recall making any of the statements contained therein.

Mr. Ruffin testified that he first spoke with police officers on November 30 and that he told the officers at that time that he "didn't see nothing." On January 5, 2010, Mr. Ruffin was brought into the police station to view a photographic lineup of potential suspects. Mr. Ruffin stated that the officers were "yelling" at him, telling him what to say, and behaving as if "they already kn[e]w who did it." When Mr. Ruffin was again brought to the police station on January 26, officers were attempting to "pin" a recent robbery on Mr. Ruffin "if [he] didn't tell them something just in the[ir] exact words." Mr. Ruffin told the officers that "[w]hatever [they] put down there [he'll] sign it" because he "just want[ed] to go home." With respect to the written statement he provided on January 27, Mr. Ruffin stated that he told the officers that the defendant had robbed the victim because the defendant was someone he knew from the neighborhood. Mr. Ruffin insisted that, when he idenified the defendant in a photographic lineup as the man who had robbed the victim, he had been forced to do so by the police. When asked why his account of the events of November 25 had changed, Mr. Ruffin testified that he had been diagnosed with paranoid schizophrenia and that he was afraid.

On cross-examination, Mr. Ruffin stated that his entire body was underneath his vehicle when he heard a "commotion" on November 25 and saw "two pairs of legs" standing near the victim. Mr. Ruffin remained beneath the vehicle and heard footsteps running away. At that time, Mr. Ruffin advised the victim not to follow the men, but he watched the victim and Mr. Winters "jump[] in the car" and leave. Mr. Ruffin testified that, when he initially spoke with police, he informed them that the victim's family had been threatening him. When Mr. Ruffin provided his January 27 statement and photographic identification of the defendant, he did so because the police officers were threatening to charge him with a different robbery.

Lieutenant David James Parks with the Memphis Police Department ("MPD") testified that he, along with MPD Detective Eric Freeman, interviewed Mr. Ruffin on both January 26 and 27 at the MPD. Lieutenant Parks explained that Mr. Ruffin was initially brought in on January 26 to discuss his role in a recent robbery and that Mr. Ruffin was provided with his *Miranda* warnings but that officers also wanted to speak with Mr. Ruffin about what he had witnessed during the robbery of the victim. Mr.

-3-

Ruffin signed a waiver of his rights, never asked for an attorney, and did not appear to be under the influence of alcohol or drugs. Lieutenant Parks denied threatening Mr. Ruffin in any way. Lieutenant Parks then interviewed Mr. Ruffin, who stated that the defendant had robbed and murdered the victim. On the following day, Mr. Ruffin provided officers with a signed, written statement in which he stated that the defendant and a "lil small short dude" had robbed the victim at gunpoint with "a black 9 or a .40." Mr. Ruffin described the defendant as either "20 or 21" years of age, five foot, 10 inches tall, and having either "dreads or braids" and a reddish skin tone.

Travis Wright testified and conceded that he gave a statement to MPD officers in January 2011 in which he admitted accompanying the defendant during the robbery of the victim, but on the witness stand, Mr. Wright denied knowing the defendant or having any involvement with the robbery or murder of the victim. When the prosecutor asked Mr. Wright to read his prior statement, Mr. Wright explained that he had difficulty reading, so the statement was read aloud to him outside the presence of the jury.

In his statement, Mr. Wright identified the defendant by name, explaining that he had known the defendant "[a]ll [of his] life." Mr. Wright stated that he was present when the defendant robbed the victim in front of the victim's apartment. Mr. Wright described how the defendant forced the victim at gunpoint to lie down "[b]y his car in the street" so that the defendant could rifle through the victim's pockets, but Mr. Wright stated that the defendant took nothing from the victim. According to Mr. Wright, after the robbery, he saw the victim in "a black car," and the defendant shot the victim with a black automatic handgun. Mr. Wright recalled that the defendant had fired "[a]bout ten shots." When asked why he had not come forward sooner, Mr. Wright stated that he "was scared to say something." Mr. Wright then identified the defendant from a photographic lineup as the man who robbed and murdered the victim.

When the jury returned to the courtroom, Mr. Wright again denied any involvement with the victim's robbery and murder, stating that he had lied when he gave his statement to police officers in 2011 out of fear that he would go to jail. Mr. Wright explained that he had chosen the defendant's picture from the photographic lineup because the defendant's name was written underneath his picture and an arrow was pointing to the picture. Mr. Wright denied having any feelings of animosity toward the defendant which would cause him to implicate the defendant in these crimes.

On cross-examination, Mr. Wright stated that police officers had picked him up and brought him to the station for questioning. Mr. Wright testified that the officers had informed him that he could be charged with murder, causing him to give the statement incriminating the defendant so that he could save himself.

MPD Lieutenant Anthony Mullins testified that he had interviewed Mr. Wright on January 2, 2011, after learning that he was present when the victim was killed. Lieutenant Mullins informed Mr. Wright that, at that point, he was both a potential suspect and a potential witness. Mr. Wright was provided with his *Miranda* warnings, which Lieutenant Mullins asked him to read aloud, and he signed a waiver of his rights. Although Mr. Wright initially denied any involvement, he eventually confessed to being present with the defendant when the defendant robbed and murdered the victim. Following his interview with Lieutenant Mullins, Mr. Wright's statement was typed and given to him to review for mistakes. Mr. Wright reviewed and signed the statement, a redacted version of which was entered into evidence. With respect to the photographic lineup shown to Mr. Wright, Lieutenant Mullins identified for the court a "master detective copy" of the same lineup, which included the names of those in the lineup and a red arrow pointing to the defendant's name; Lieutenant Mullins explained that this master copy was never shown to Mr. Wright.

On cross-examination, Lieutenant Mullins conceded that he was aware that some evidence had come to light during his investigation that contradicted things said by Mr. Wright. On redirect examination, Lieutenant Mullins confirmed that Mr. Wright was not arrested following his January interview and statement because he was considered a witness at that point rather than a suspect.

MPD Officer Alfred Neely testified that he was the first officer on the scene of the shooting on November 25 and that he arrived at apprioximately 9:00 p.m. Upon his arrival, he observed "a black Infinity [sic] occupied by a male black driver" and that the vehicle was "just riddled with bullets on the whole driver's side." According to Officer Neely, the victim "had been shot multiple times," and he opined that the victim's apartment was located less than half a mile from the crime scene.

MPD Officer and Crime Scene Investigator Eric Carlisle responded to the scene of the shooting on November 25 and recovered 14 spent shell casings and three bullet fragments. Officer Carlisle photographed two bullet holes in the front windshield of the victim's vehicle, and, at the hospital, he recovered $638 in cash from the victim's person.

MPD Officer and Crime Scene Investigator Newton Morgan examined the victim's vehicle following the shooting and located seven bullet fragments, although he was only able to recover six of the fragments because the seventh fell from the windshield into the vehicle's vents before he could collect it. Officer Morgan determined that there were nine bullet holes in the victim's vehicle.

Tennessee Bureau of Investigation ("TBI") Special Agent and Forensic Scientist Cervinia Braswell testified as an expert witness in the area of firearms identification. Agent Braswell examined the shell casings, bullets, and bullet fragments recovered from the crime scene and determined that all 14 of the shell casings were fired from the same nine-millimeter semiautomatic handgun. With respect to the bullets and bullet fragments, Agent Braswell opined that all had been fired from the same nine-millimeter handgun, although she explained that because the shell casings and bullets are "marked by separate parts of the gun," she was unable to say with any certainty whether the casings and bullet fragments were fired from the same nine-millimeter handgun.

Doctor Marco Ross, a forensic pathologist and deputy chief medical examiner of the West Tennessee Regional Forensic Center, testified that he performed the victim's autopsy. Doctor Ross determined that the victim had sustained a gunshot wound to the head and that the bullet had entered the left side of the head, passed through the victim's brain, and exited on the right side. Doctor Ross opined that the cause of the victim's death was the gunshot wound to his head and that the manner of death was homicide.

Carlos Bush, an acquaintance of both the defendant's and the victim's, testified that, on a night in late 2009, he and a man named "Don" were standing outside a store in the vicinity of the shooting when the defendant and another man arrived in a white vehicle. The defendant was "acting kind of strange[,] like out of breath" and he told Mr. Bush and Don that "[h]e just put in some work," which Mr. Bush took to mean that the defendant had just shot or beaten someone. Mr. Bush recalled that helicopters and police cars were circling the area during this time and that the defendant had shown Don a black nine-millimeter handgun. A few minutes later, the defendant and the other man drove away.

In late January 2010, Mr. Bush was arrested on unrelated charges. Shortly thereafter, he encountered the defendant, who told Mr. Bush more information about the victim's murder:

> [The defendant j]ust said [the victim] was sitting in the car. [The defendant] pulled up – well, he ran up on and dumped on him like four or five times.

Mr. Bush explained that he understood "dump on him" to mean that the defendant had shot the victim. According to Mr. Bush, the defendant told him that he had shot the victim in the chest and the face. Mr. Bush then wrote to MPD detectives informing them of his conversation with the defendant in the hope that providing this information to the police would assist him with his recent criminal charges.

On February 10, 2010, Mr. Bush met with MPD detectives, provided them with a statement, and, after viewing a photographic lineup, identified a photograph of the defendant as the person who had murdered the victim. A few days later, Mr. Bush again encountered the defendant, who told Mr. Bush that "homicide" had been questioning him. The defendant also told Mr. Bush that "somebody was with" the victim at the time of the shooting and that Mr. Bush could "ask Wookie how he dumped on" the victim. Mr. Bush testified that he never received any assistance from the police in exchange for the information that he provided and that he was currently serving a 15-year federal sentence.

On cross-examination, Mr. Bush acknowledged that he did not initially come forward with his information on the victim's murder and that he had previously provided information to the police in other cases but that he had never received any preferential treatment. Mr. Bush admitted that he did not know the identity of the person the defendant had referred to as "Wookie" and conceded that he had lied to the defendant about having "gotten into it" with the victim in 2006, explaining that he had done so in order to get the defendant to "talk[] about what happened" to the victim.

With this evidence, the State rested. Following the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant elected not to testify but did choose to present proof.

Jessica Baptist, the defendant's niece, testified that November 25 was the eve of Thanksgiving and that she, the defendant, and other family members were gathered in Walls, Mississippi, at the home of her aunt, Jamia Scaife, to prepare food for the following day. According to Ms. Baptist, she left Ms. Scaife's house with the defendant and his girlfriend, Kita, around 9:00 p.m. to make the 35-minute drive from Walls to Memphis. Upon arriving in Memphis, the defendant drove to the home of Ms. Baptist's grandmother, Ida Taylor, to return a cake mixer. Ms. Baptist stayed with Ms. Taylor, and the defendant and Kita left to return to Walls.

Iasha Avant, the defendant's sister, testified that she was preparing food and traveling between Ms. Taylor's house and Ms. Scaife's house throughout the day on November 25. Although she knew that the defendant was with her on November 25, she could not recall "the exact time" that she saw him.

Jedaren Allen, the defendant's brother, testified that the defendant was already present at Ms. Scaife's residence when he arrived in the early evening hours of November 25. Mr. Allen recalled that the defendant left at some point to drive Ms.

Baptist and others back to Memphis and that the defendant later returned to Ms. Scaife's residence, although he could not recall the time.

Jamia Scaife, the defendant's sister, testified that the defendant arrived at her house "around 5:30, six, in the afternoon" of November 25 and that the defendant left "about 9:30, 10 o'clock that night" to return a cake mixer to Ms. Taylor. Ms. Scaife estimated that the defendant was gone between 45 minutes and one hour before returning to her residence with his girlfriend. The defendant stayed at Ms. Scaife's house overnight.

Based on this evidence, the jury convicted the defendant of the lesser included offenses of second degree murder and attempted aggravated robbery and acquitted the defendant of the firearm charge. Following a sentencing hearing, the trial court imposed a 25-year sentence for the second degree murder conviction and a six-year sentence for the attempted aggravated robbery conviction, to be served concurrently to one another for an effective sentence of 25 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by admitting certain witness testimony and that the evidence adduced at trial was insufficient to support his convictions. We will address each issue in turn.

*I. Witness Testimony*

The defendant first contends that the trial court erred by permitting the State to call Mr. Ruffin and Mr. Wright as witnesses "for the sole purpose of impeaching them [with their] prior inconsistent statements." Because, as argued by the defendant, the MPD officers who took the statements of the witnesses were called to testify immediately following the testimony of the respective witness, such order of testimony "suggests that the State knew that each man would recant his testimony and was immediately prepared to offer the officers to provide substantive proof as to each of the statements."

The defendant relies on *Mays v. State*, 495 S.W.2d 833 (Tenn. Crim. App. 1972), for the proposition that a witness may not be called to testify at trial for the sole purpose of impeachment by introduction of that witness's prior statement. In *Mays*, two witnesses called by the State to testify against the defendants at trial refused to implicate the defendants in the crime, at which point the State impeached the witnesses with their prior inconsistent statements to law enforcement officers. *Id.* at 836. The defendant posits that, because the State was aware as early as the preliminary hearing that the witnesses had repudiated their statements and intended to do so at trial, the trial court erred by permitting the impeachment because "it was calculated to and did serve only one

-8-

purpose which was to put before the jury the out of court statements." *Id.* at 836-37; *see also State v. Steve Johnson*, No. 02-C-01-9504-CC-00097, slip op. at 12-15 (Tenn. Crim. App., Jackson, Feb. 27, 1997) (reversing defendant's conviction upon a finding that the State was on notice that witness intended to repudiate statement against defendant and that the trial court's subsequent curative instruction to jury to disregard witness's testimony was "insufficient to overcome the serious prejudicial effect of putting the out of court statements made by [the witness] in front of the jury"); *State v. Roy L. Payne*, No. 03C01-9202-CR-45, slip op. at 4 (Tenn. Crim. App., Knoxville, Feb. 2, 1993) (reversing defendant's conviction upon a finding that State was on notice that witness would repudiate prior statement against defendant and holding that "such impeachment cannot be a mere ruse to introduce highly prejudicial and improper testimony").

Here, however, the defendant failed to object, at any point during the trial, to the introduction of either witness's prior inconsistent statement, and thus, he has waived our review of this issue on appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific objection is not apparent from the context.").

Moreover, our review of the trial transcripts reveals that the State intended to introduce the redacted statements of both witnesses under Tennessee Rule of Evidence 803(26), which provides that a prior inconsistent statement of a testifying witness may be admitted as substantive evidence if that statement is otherwise admissible under Rule 613(b) and:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.
>
> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.
>
> (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26). Although the statements generally met the terms of both Rule 613(b) and Rule 803(26), the trial court did not make the requisite finding of trustworthiness because the parties agreed that the redacted statements were admissible. Accordingly, any failure by the trial court to make the trustworthiness finding is excused by the parties' agreement, and the defendant is therefore bound by this agreement pursuant to Rule 36(a). Even if, however, the statements were not properly admitted under Rule 803(26), the defendant failed to ask the court to instruct the jury to limit the use of the statements to impeachment and made no objection to their introduction, and the redacted statements were therefore admissible as substantive evidence of the defendant's guilt. *See State v. Smith*, 24 S.W.3d 274, 279-80 (Tenn. 2000).

In any event, the defendant has offered nothing, other than his belief that the order of the witnesses at trial suggested that the State knew that Mr. Ruffin and Mr. Wright would recant their statements, to support his claim that the State's use of the witnesses' prior inconsistent statements was in error. Nothing in the record suggests that the impeachment "was calculated to and did serve only one purpose which was to put before the jury the out of court statements." *Mays*, 495 S.W.2d at 837. For all of these reasons, this argument must fail.

## II. Sufficiency

Next, the defendant argues that the evidence adduced at trial was insufficient to support his convictions. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.

*Id.*

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. Aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a).

Criminal attempt is committed when a person, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2).

Here, the proof adduced at trial established that, on the evening of November 25, 2009, the defendant and Mr. Wright accosted the victim outside the victim's residence, where the defendant forced the victim onto the ground at gunpoint before rifling through the victim's pockets and fleeing with Mr. Wright. A short time later, while the victim and Mr. Winters were driving around in an apparent search for the perpetrators of the attempted aggravated robbery, the defendant fired 14 gunshots from a semiautomatic handgun at the victim's vehicle and struck the victim in the head, killing him.

Mr. Ruffin, Mr. Wright, and Mr. Bush all positively identified the defendant in separate photographic lineups; Mr. Ruffin idenitified him as the man who attempted to rob the victim, and Mr. Wright and Mr. Bush identified him as the man who shot the victim. Ballistics testing concluded that all shells collected from the scene had been fired from the same nine-millimeter semiautomatic handgun and that all bullets and bullet fragments recovered from the scene had also been fired from a nine-millimeter handgun. Mr. Bush stated that he had seen the victim with a nine-millimeter handgun shortly after the shooting occurred.

The defendant primarily takes issue with the State's failure to identify him as the perpetrator of the crimes. Specifically, the defendant claims that the testimony of Mr. Ruffin and Mr. Wright was suspect due to their recanting of their statements and that their testimony was not sufficiently corroborated by other witnesses, such as Mr. Bush. We perceive this argument to be one of credibility concerns. The jury, however, as the trier of fact, resolves all questions of witness credibility, and it clearly found the

-11-

identification by multiple witnesses of the defendant as the perpetrator of the attempted aggravated robbery and murder of the victim to be credible. *See Cabbage*, 571 S.W.2d at 835.

Taking all of this evidence into consideration, we find that the defendant intended to deprive the victim of his property by violence or placing him in fear and by display of a deadly weapon and that the defendant knowingly killed the victim. Thus, the evidence sufficiently supports the defendant's convictions of the lesser included offenses of second degree murder and attempted aggravated robbery.

Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE